# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID VITALE,<br><br>    Plaintiff,<br><br>  v.<br><br>NEW JERSEY STATE POLICE; DAVID JENKINS, Individually and in His Capacity as a Member of the New Jersey State Police; WILLIAM DUBY, Individually and in His Capacity as a Member of the New Jersey State Police; JOHN HALPIN, Individually and in His Capacity as a Member of the New Jersey State Police; E. CLOWES, Individually and in His Capacity as a Member of the New Jersey State Police; T. WALLS, Individually and in His Capacity as a Member of the New Jersey State Police; and JOHN DOES (1-10), Individually and in Their Capacity as Members of the New Jersey State Police,<br><br>    Defendants. | **CASE NO.**<br><br>**COMPLAINT & JURY DEMAND** |

## JURISDICTION

1. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985, as well as the Fourth and Fourteenth Amendments of the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343(a)(3) and the forementioned statutory and constitutional provisions.

2. Jurisdiction lies over any state law claims based on the principles of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

3. The amount in controversy, exclusive of interest and costs exceeds the sum of $100,000.00.

## PARTIES

4. Plaintiff, David Vitale ("Plaintiff" or "Vitale") is a resident of the Township of Wayne, New Jersey, and a citizen of the United States of America.

5. Defendant New Jersey State Police (hereinafter the "NJSP") is a law enforcement agency under the auspices of the State of New Jersey. The NJSP is obligated to oversee police officers under its control. It is the duty of both the NJSP and the officers over whom it supervisors to protect and serve the citizens of the State of New Jersey. Accordingly, the NJSP is responsible for properly hiring, training, and supervising its officers while they exercise their duties and responsibilities.

6. At all relevant times herein, Defendant David Jenkins ("Jenkins") was employed by and acting in the course of his employment as a NJSP State Trooper. Accordingly, Jenkins is charged with the obligation and responsibility to protect the citizens of the State of New Jersey and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of his duties. He is sued individually and in his capacity as a State Trooper.

7. At all relevant times herein, Defendant William Duby ("Duby") was employed by and acting in the course of his employment as a NJSP State Trooper. Accordingly, Duby is charged with the obligation and responsibility to protect the citizens of the State of New Jersey and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of his duties. He is sued individually and in his capacity as a State Trooper.

8. At all relevant times herein, Defendant John Halpin ("Halpin") was employed by and acting in the course of his employment as a NJSP State Trooper. Accordingly, Halpin is charged with the obligation and responsibility to protect the citizens of the State of New Jersey

and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of his duties. He is sued individually and in his capacity as a State Trooper.

9. At all relevant times herein, Defendant E. Clowes ("Clowes") was employed by and acting in the course of his employment as a NJSP State Trooper. Accordingly, Clowes is charged with the obligation and responsibility to protect the citizens of the State of New Jersey and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of his duties. He is sued individually and in his capacity as a State Trooper.

10. At all relevant times herein, Defendant T. Walls ("Walls") was employed by and acting in the course of his employment as a NJSP State Trooper. Accordingly, Walls is charged with the obligation and responsibility to protect the citizens of the State of New Jersey and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of his duties. He is sued individually and in his capacity as a State Trooper.

11. At all relevant times herein, John Does (1-10) were employed as NJSP State Troopers. Their identities are unknown at this time but may become known during this lawsuit. Accordingly, they are charged with the obligation and responsibility to protect the citizens of the State of New Jersey and to abide by the laws of both the State of New Jersey and the United States during the lawful exercise of their duties. There are sued individually and in their capacities as a State Troopers.

**FACTS COMMON TO ALL COUNTS**

12. On or about May 31, 2020, Vitale was employed as a teacher with the Dover Board of Education.

13. Prior to May 31, 2020, Vitale had been offered and he accepted tenure with the Dover Board of Education.

14. On or about May 31, 2020, Vitale was thirty-seven (37) years old, stood five feet, six inches (5' 6") tall, and weighed one hundred forty pounds (140 lbs.).

15. At all relevant times herein, Vitale suffered from HIV and identifies as a homosexual.

16. On or about May 31, 2020, Vitale had no prior criminal record.

17. In the late evening of May 31, 2020, Vitale was driving his white, 2009 Suzuki sport utility vehicle (the "SUV") to his apartment in Dover, New Jersey.  He drove on Route 280 West and merged onto Route 80 West.

18. At all relevant times herein, Vitale wore his seatbelt and adhered to all traffic laws, including the speed limit.

19. At no time was Vitale in possession of a handgun, and never stored a handgun in the SUV.

20. During his drive, Vitale observed police patrol cars on the shoulder of Route 80 West.

21. Dash camera video footage from May 31, 2020, depicts State Trooper vehicles tailing Vitale's SUV for no less than three (3) minutes before the State Troopers activated their flashing lights.

22. Vitale observed the flashing lights, but was not sure whether the State Trooper's signals were intended for him.  In response, Vitale safely, and in accordance with all traffic laws, moved from Route 80 West's center lane into the right lane and slowed the SUV down.

23. As Vitale approached his Route 80 West exit (Exit 35A) he slowed the SUV down to allow the State Troopers to pass him.

24. Because he was driving within the speed limit and obeying all traffic laws, Vitale had no reason to believe the State Troopers' flashing lights were intended for him.

25. When Vitale slowly exited Route 80 West at Exit 35A, he observed in his rear-view mirror multiple State Trooper vehicles also exiting Route 80 West.

26. At or about this time, Vitale rolled down the SUV's driver side window to listen for any sirens or instructions from the State Troopers. However, the State Troopers did not blare their sirens nor did they verbally command for Vitale to pull over the SUV.

27. After exiting Route 80 West and now realizing the State Troopers were intentionally following him, Vitale slowed down the SUV, stopped momentarily to allow deer to cross the road, and safely pulled into the entrance of the Rockaway Mall. He then brought the SUV to a safe and complete stop.

28. Upon information and belief, State Troopers Jenkins, Duby, Halpin, Clowes, and Walls detached from their clothes or otherwise rendered their body cameras inoperable before engaging Vitale.

29. Upon information and belief, although officers involved in Vitale's traffic stop were equipped with body cameras, the officers' body cameras were detached from their clothes, turned off, or otherwise not functioning at that time and did not record footage of Vitale's traffic stop.

30. After Vitale's arrest, the Morris County Prosecutor's office confirmed that no body camera footage of his traffic stop and arrest exists.

31. According to Dash camera video footage, Defendants never gave Vitale any instructions before approaching him. Instead, within seconds of Vitale bringing his SUV to a safe and complete stop, State Troopers Jenkins, Duby, Halpin, Clowes, Walls and other unidentified

State Troopers swarmed the driver side door of the SUV. One unidentified State Trooper reached his hand inside the open driver side window and manually unlocked and threw open the door.

32. At the same time, Walls, without justification, violently smashed his fist through the glass of the SUV's passenger side window, dove headfirst through the SUV's window, and shoved Vitale out the driver side door and into the waiting arms of multiple State Troopers.

33. Vitale covered his face with his hands to shield himself from the shattered glass.

34. Defendants, with their service weapons drawn, wrenched Vitale by his arms, shoulders, and neck out of the SUV, and smashed him face-down onto the pavement.

35. Vitale, terror stricken and with his hands covering his face, did not, nor was he physically able to resist Defendants. Still, Defendants repeatedly shouted for Vitale, "Motherfucker," "Get the fuck out of the car," and "stop resisting."

36. As Vitale laid prone and face down on the pavement, Defendants, without justification, repeatedly kicked and punched him in the back, sides, face, and skull.

37. One unidentified officer lifted and bashed Vitale's head into the pavement no less than four (4) times.

38. Duby has admitted to striking Vitale several times with a closed fist.

39. Defendants also lifted Vitale's head and smashed his face into the pavement.

40. With no understanding as to why Defendants were assaulting him, Vitale, in excruciating pain, bleeding, and believing he would die, screamed in Spanish, "God help me."

41. At one point, an unidentified officer shouted "That's enough" at the other officers who were assaulting Vitale.

42. Defendants never told Vitale why they were assaulting him.

43. As a result of the Defendants' unlawful actions, Vitale suffered several physical and emotional injuries including: head and facial contusions; fracture of the nasal bone, which required reconstructive surgery; epistaxis due to trauma; periorbital and ocular contusion of the left eye; a subconjunctival hemorrhage of the left eye; chest wall contusions and abrasions; left and right forearm abrasions; abdominal wall abrasions; acute cervical strain; colitis and ulcerative colitis; thoracic and lumbar injuries, including disc herniations and bulging discs; post-concussion brain damage; cognitive limitations including difficulty speaking; severe emotional distress; and continued post-traumatic stress disorder.

44. While Defendants initially suspected that the SUV had been stolen, Defendants made no attempt to confirm whether the SUV was in fact stolen before they assaulted Vitale.

45. Indeed, Vitale's SUV was never reported stolen and was owned by a family member.

46. According to Defendants, a person named Ryan Chandler, driving a 2013 Ford Taurus Police Interceptor, had called 911 and informed dispatch that a person driving a white Suzuki SUV had shot at him around Exit 13 on Route 280 West. Upon information and belief, Defendants made no attempt to question Ryan Chandler after stopping Vitale to evaluate the veracity of his statements made to 911.

47. Dash camera video footage from Defendants' responding vehicles highlights the State Troopers' reckless disregard for Vitale's Constitutional rights and their attempts to manufacture some semblance of probable cause for their vicious behavior.

48. On dash camera video footage from a State Trooper's vehicle, an unidentified State Trooper admitted that the SUV's license plate "Didn't match CAD."

49. Dash camera video footage captured State Troopers searching the SUV for a weapon and asking Vitale if the SUV was stolen. An unidentified State Trooper can also be heard admitting that "the gun can't be in here."

50. On dash camera video footage, an unidentified State Trooper is heard fabricating that "Sergeant Dias was saying at 8 Alpha Bravo [i.e., Exit 8AB on 280] he [i.e., Vitale] pulled over and threw something out of the window."

51. NJSP, however, never recovered a weapon at Exit 8AB on Route 280 West.

52. On dash camera video footage, an unidentified State Trooper admitted that the NJSP recovered nothing, including a weapon, in the SUV, and that a records search of the SUV revealed that it was owned by Vitale's parent.

53. On dash camera video footage, an unidentified State Trooper fabricated that "[He] saw him [i.e., Vitale] on 280, [he] backed off, and then a motorist stopped [him] and said that's the guy." On dash camera video footage, another unidentified State Trooper can be heard admitting that the SUV's license plate did not match the description, so he backed off.

54. On dash camera video footage, Walls falsely told other State Troopers that Vitale hit him in the face, which caused a black eye.

55. On dash camera video footage, Defendants shoved Vitale into the back of a patrol vehicle and proceeded to interrogate Vitale, asking if he had caused a social disturbance and if he was part of Antifa.

56. On dash camera video footage, one unnamed officer sarcastically told Vitale, "You look pretty beat up for someone who was willing to stop." Another falsely accused him of fleeing the State Police, asking, "Why did he run?"

57. An unidentified Trooper can be heard on dash camera video footage falsely stating that "This little guy is pretty strong for a little guy. . . still fighting on the ground. Wow."

58. On dash camera video footage, another unidentified State Trooper accused Vitale of being intoxicated, saying "he's [i.e., Vitale] drunk right?"

59. Vitale had no alcohol in his system that evening.

60. Dash camera video footage from after the assault depicts Defendants and other unidentified State Troopers picking up their body cameras off the ground and reattaching them, because they had, "fallen off."

61. After assaulting Vitale, several State Troopers had blood on their hands. When they asked Vitale if he suffered from any illnesses, he responded that he suffered from HIV.

62. Dash camera video footage captured unidentified State Troopers talking about Vitale. One State Trooper falsely accused Vitale of propositioning him and asking him "What [he was] doing tomorrow." In response, another State Trooper laughed and made the derogatory comment, "He's [Vitale] getting fucked in the ass tomorrow probably."

63. Dash camera video footage depicts a State Trooper falsely accusing Vitale of taking drugs, saying "I don't know what the dude is on."

64. Vitale was not under the influence of any substances at the time of the events.

65. Defendants drove Vitale to St. Claire's Hospital. Once admitted, Defendants surrounded Vitale's hospital bed and proceeded to interfere with medical treatment. Their conduct became so intrusive that at one point the doctor treating Vitale asked State Troopers if they were "Going to let [him] see if [his] patient will live or die? Please let me in."

66. Defendants acted under color of law.

67. Defendants' conduct, in assaulting Vitale or otherwise causing him injury, constituted an excessive use of force that violated Vitale's substantive and procedural due process and equal protection rights, as well as the privileges and immunities secured by the Constitution of the United States and Constitution of the State of New Jersey.

68. Further, Defendants conduct resulted in the unlawful arrest of Vitale, together with Plaintiff being unlawfully imprisoned and wrongfully charged, all of which deprived Vitale of substantive and procedural due process, equal protection, and privileges and immunities protected by the Constitution of the United States and the Constitution of the State of New Jersey.

69. As a result of Defendants' unlawful actions, Vitale lost his employment with the Dover Board of Education.

70. Defendants' actions violate N.J.S.A. 10:6-1, *et seq.* of the "New Jersey Civil Rights Act," Article I of the New Jersey State Constitution, 42 U.S.C. § 1983, *et seq.*, and the Fourth and Fourteenth Amendments to the United States Constitution.

71. NJSP's customs and policies and deliberate indifference to properly train, supervise, and control its State Troopers caused or otherwise contributed to the harm Vitale endured.

## COUNT I

### 42 U.S.C. § 1983 Action.

72. Plaintiff repeats each of the allegations set forth in Paragraphs 1 through 71 as if set forth at length herein.

73. Defendants, acting under color of law, did violate Plaintiff's rights protected by the Fourth and Fourteenth Amendments to the United States Constitution, including, but not limited to, his substantive and procedural due process rights and his equal protection rights.

74. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was caused to suffer damages, including financial loss, severe bodily injury, and emotional and mental anguish.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, including:

(1) Compensatory damages;

(2) Pain and suffering;

(3) Emotional distress;

(4) Punitive damages;

(5) Attorneys' fees and costs as provided by law; and

(6) Such other relief as the Court may deem appropriate.

## COUNT II

**Violations of the New Jersey Civil Rights Act (N.J.S.A. 10:6-1, *et seq*.)**

75. Plaintiff repeats and realleges each and every allegation set forth in Paragraph 1 through 74 as if set forth at length herein.

76. Defendants, acting under the color of law, did violate Plaintiff's protected rights set forth in Article I of the New Jersey State Constitution, including, but not limited to, Plaintiff's right to substantive due process and to equal protection. Same is enabled through the New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et seq.*

77. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was caused to suffer damages, including financial loss, severe bodily injury, and emotional and mental anguish.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, including:

(1) Compensatory damages;

(2) Pain and suffering;

(3) Emotional distress;

(4) Punitive damages;

(5) Attorneys' fees and costs as provided by law; and

(6) Such other relief as the Court may deem appropriate.

## COUNT III

### Intentional Infliction of Emotional Distress

78. Plaintiff repeats and realleges each and every allegation set forth in Paragraph 1 through 77 as if set forth at length herein.

79. Defendants' unlawful actions were intended to cause Plaintiff emotional distress or were otherwise reckless, insofar as Defendants acted with a deliberate disregard of a high degree of probability that emotional distress would follow their actions.

80. Defendants' actions were so extreme and outrageous they went beyond the bounds of human decency, were atrocious, and were utterly intolerable in a civilized community.

81. Defendants' actions proximately caused Plaintiff to endure emotional distress that was so severe that no reasonable person could be expected to endure it.

**WHEREFORE**, Plaintiff demands judgment against all Defendants, jointly and severally, including:

(1) Compensatory damages;

(2) Pain and suffering;

(3) Emotional distress;

(4) Punitive damages;

(5) Attorneys' fees and costs as provided by law; and

(6) Such other relief as the Court may deem appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues in the Complaint.

## DESIGNATION OF TRIAL COUNSEL

Plaintiff hereby designates Robert B. Woodruff, Esq. and Kieran M. Dowling, Esq. as trial counsel in this matter.

By: */s/ Robert B. Woodruff*
Robert B. Woodruff (RBW 0245)
(rwoodruff@schiller.law)
1771 Front Street
Scotch Plains, NJ 07076
(908) 490-0444

*Counsel for Plaintiff, David Vitale*